114 FERC ¶ 61,257
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Joseph T. Kelliher, Chairman;
Nora Mead Brownell, and Suedeen G. Kelly.

Midwestern Gas Transmission Company Docket No. CP05-372-000

ORDER ISSUING CERTIFICATE

(Issued March 10, 2006)

1. On June 6, 2005, Midwestern Gas Transmission Company (Midwestern) filed an application under section 7(c) of the Natural Gas Act (NGA) and Part 157 of the Commission's regulations for a certificate of public convenience and necessity to construct and operate approximately 30 miles of pipeline and related facilities, known as the Eastern Extension Project, in Sumner and Trousdale Counties, Tennessee to transport 120,000 Dth per day of natural gas to Piedmont Natural Gas (Piedmont). As discussed below, the Commission finds that Midwestern's proposed project is required by the public convenience and necessity and, therefore, grants the requested authorizations, subject to conditions.

## I. Background and Proposal

2. Midwestern, a natural gas company within the meaning of the NGA, operates an existing pipeline system consisting of a 30-inch diameter pipeline and appurtenant facilities extending from an interconnection with ANR Pipeline Company located near Joliet, Illinois to a point of interconnection with Tennessee Gas Pipeline Company (Tennessee Gas) near Portland, Tennessee. Midwestern's existing pipeline system connects with multiple interstate pipeline systems and has the capability to provide bi-directional transportation service to markets in Kentucky, Indiana, Illinois, and Tennessee, as well as to the Chicago Hub.

### A. New Facilities

3. Midwestern proposes to construct and operate approximately 30.9 miles of 16-inch diameter pipeline commencing at Midwestern's existing Compressor Station No. 2101 located near the City of Portland in Sumner County, Tennessee (Portland

Compressor Station) and traversing southeasterly to two separate proposed new interconnections with Columbia Gulf Transmission Company (Columbia Gulf) and East Tennessee Natural Gas, LLC (East Tennessee) located near the City of Hartsville in Trousdale County, Tennessee. Midwestern also proposes to modify existing station piping at the Portland Compressor Station to accommodate the tie-in of the proposed facilities and enable bi-directional flow capability at the compressor station. In addition, Midwestern proposes to construct various pressure control valves and pipeline block valves, as well as data acquisition control and meter enclosures to house measurement and flow equipment at the two proposed pipeline interconnections.

4. The proposed Eastern Extension Project is designed to receive and transport up to 120,000 Dth of natural gas per day. Midwestern estimates that the proposed project will cost approximately $26.3 million to construct and install. Midwestern proposes to place the facilities into service on November 1, 2006.

### B. Market and Service

5. Midwestern states that in response to market inquiries, it conducted an open season from April 23 through May 28, 2004, to solicit interest in extending its pipeline system. Midwestern solicited bids for firm transportation under either of two route options, both routes originating at the Portland Compressor Station. Route A consisted of a 30-mile extension southeasterly to potential interconnections in Trousdale County, Tennessee with Columbia Gulf, East Tennessee, and Texas Eastern Transmission Company (Texas Eastern). Route B consisted of a 40-mile extension in an easterly direction to potential interconnects with Columbia Gulf and Texas Eastern in Monroe County, Kentucky. Midwestern received a single bid from Piedmont for the transportation of 120,000 Dth per day of natural gas capacity on Route A with deliveries to Columbia Gulf and East Tennessee. No bids were received for Route B or to the Texas Eastern interconnect on Route A.

6. Based on the open season, Midwestern executed a precedent agreement with Piedmont for 120,000 Dth per day, the full capacity of the proposed 30-mile pipeline extension from the Portland Compressor Station.[1] The precedent agreement provides

---

[1] Midwestern also held an open season in June 2004, for available existing capacity from Joliet, Illinois to Portland, Tennessee. As a result of that open season, Midwestern executed a firm transportation agreement with Piedmont under its existing Rate Schedule FT-A for 120,000 Dth of natural gas per day on Midwestern's existing mainline from the existing interconnection on Midwestern's system referred to as "Joliet" to an existing delivery point on Midwestern's system referred to as "Portland."

for Midwestern and Piedmont to enter into a firm transportation agreement under a proposed new incremental rate schedule, Rate Schedule FT-B, for a term of fifteen years, subject to certain conditions and the receipt of the necessary regulatory approvals, and sets forth a fixed, incremental negotiated rate for the service to Piedmont.

7. Specifically, Midwestern will deliver 100,000 Dth per day into the Columbia Gulf pipeline system near Hartsville, Tennessee. Piedmont plans to make this natural gas available to its subsidiary, Nashville Gas Company (Nashville Gas), which serves residential, commercial and industrial customers in Cheatham, Davidson, Dickson, Robertson, Rutherford, Sumner, Trousdale, Williamson, and Wilson Counties, Tennessee. The remaining 20,000 Dth per day will be delivered into the East Tennessee pipeline system for ultimate delivery to Piedmont's distribution systems in North and South Carolina.

8. Midwestern states that the proposed Eastern Extension Project serves Piedmont's needs by providing: (1) the infrastructure to transport additional natural gas volumes necessary to meet growing natural gas demand in the Nashville, Tennessee area and in North and South Carolina; (2) increased supply diversity, supply reliability, and price competition resulting from access to natural gas supplies originating from the Chicago Hub, i.e., the Canadian, Rocky Mountain, Mid-Continent, Permian and, in the future, Alaskan and MacKenzie Delta natural gas supply regions; and (3) increased reliability and flexibility in the natural gas transportation grid resulting from an additional transportation alternative and new interconnects between interstate pipeline systems.

### C. Rates

9. Midwestern states that firm transportation service for Piedmont on the Eastern Extension Project will be provided under an incremental negotiated rate under the proposed new firm transportation rate schedule, Rate Schedule FT-B, which will become a part of Midwestern's FERC Gas Tariff Third Revised Volume No. 1. According to Midwestern, the executed precedent agreement between Midwestern and Piedmont establishes a fixed negotiated rate of $0.0804 per Dth, which is subject to adjustment based upon the actual construction costs.

10. Midwestern proposes a firm maximum monthly reservation recourse rate for transportation service under Rate Schedule FT-B of $3.2854 per Dth, which equates to a daily reservation recourse rate of $.1080 per Dth. Midwestern proposes a zero commodity rate under Rate Schedule FT-B since it expects no variable costs attributable to the new incremental service. Midwestern proposes to establish an incremental rate for interruptible transportation service on the Eastern Extension Project and proposes to provide service under the terms and conditions of Midwestern's existing Rate Schedule IT. Midwestern states that the recourse rate for interruptible transportation service on the

Eastern Extension Project will be $.1080 per Dth, based upon a 100 percent load factor derivative of the proposed Rate Schedule FT-B recourse rate.

11. Further, Midwestern states that the FERC Annual Charge Adjustment Surcharge (ACA Surcharge) set forth in Midwestern's FERC Gas Tariff will apply to firm and interruptible deliveries on the Eastern Extension Project under proposed Rate Schedule FT-B and existing Rate Schedule IT, respectively. In addition, Midwestern proposes to assess all firm and interruptible shippers transporting gas on the proposed Eastern Extension Project the fuel retention and loss quantity charge set forth on its summary of rates and charges,[2] since such service will require mainline compression to deliver the gas to the downstream delivery points on the Eastern Extension Project.

## II. Notice, Interventions, and Protests

12. Public notice of Midwestern's application was published in the *Federal Register* on June 22, 2005 (70 Fed. Reg. 36134). Ten parties filed timely, unopposed motions to intervene.[3] Some of the intervenors filed comments and/or protests to Midwestern's application.[4] Additionally, a number of landowners, organizations, and public officials or entities filed comments voicing strong opposition to the application.[5] Midwestern filed an answer to the comments and protests on July 20, 2005. Under Rule 213(a)(2) of the Commission's regulations, answers to protests are not permitted unless otherwise ordered by the decisional authority.[6] We will accept Midwestern's answer because it has

---

[2] *See* Seventh Revised Sheet No. 5. The currently effective in-kind fuel reimbursement charge is one percent of all transported volumes on Midwestern's system.

[3] Timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's Rules of Practice and Procedure. *See* 18 C.F.R. § 385.214(a)(3) (2005).

[4] Columbia Gulf initially protested Midwestern's proposed Eastern Extension Project on the basis that the existing Columbia Gulf pipeline system has the capacity available to transport the 120,000 Dth per day of natural gas to serve Piedmont's needs. However, on January 4, 2006, Columbia Gulf filed a motion to withdraw its protest, acknowledging that, unlike the proposed project, its system does not have access to supply sources at the Chicago Hub. Under Rule 216 of the Commission's regulations, motions to withdraw, if not opposed with 15 days, are granted by operation of law. No opposition to Columbia Gulf's motion to withdraw its protest was filed.

[5] A complete list of intervenors and commenters is listed in Appendix A.

[6] 18 C.F.R. § 385.213(a)(2) (2005).

provided us with information that has assisted us in our decision-making process. Protests are addressed below. Comments are addressed in the Environmental Assessment (EA) and below.

## III. Discussion

13. Since the proposed facilities will be used to transport natural gas in interstate commerce, subject to the jurisdiction of the Commission, the construction, acquisition, and operation of the facilities are subject to the requirements of subsections (c) and (e) of section 7 of the NGA.

### A. Application of the Certificate Policy Statement

14. The Commission's September 15, 1999 Certificate Policy Statement provides guidance as to how it will evaluate proposals for certificating new construction.[7] The Certificate Policy Statement established criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest. The Certificate Policy Statement explains that in deciding whether to authorize the construction of major new pipeline facilities, the Commission balances the public benefits against the potential adverse consequences. Our goal is to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, and the avoidance of the unnecessary exercise of eminent domain or other disruptions of the environment.

15. Under this policy, the threshold requirement for pipelines proposing new projects is that the pipeline must be prepared to financially support the project without relying on subsidization from its existing customers. The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline. If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, we will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects. This is essentially an economic test. Only when the benefits outweigh the adverse effects on economic interests will we proceed to complete the environmental analysis where other interests are considered.

---

[7]Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC ¶ 61,227 (1999), order on clarification, 90 FERC ¶ 61,128, order on clarification, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

### 1. Subsidization and Impact on Existing Customers

16. The proposed Eastern Extension Project is designed to provide incremental service to Piedmont at incremental rates; therefore, the Eastern Extension Project satisfies the threshold requirement since it will not rely on financial subsidies from existing shippers. The proposed negotiated rate between Midwestern and Piedmontwill allow Midwestern to recover the costs associated with the Eastern Extension Project. Additionally, projections submitted by Midwestern for the first three years of service for the project show that the estimated incremental revenues from the Eastern Extension Project will exceed the incremental costs.[8] Accordingly, Midwestern's existing shippers will not assume any cost responsibility for the proposed project. Neither will they suffer any degradation in service as a result of the project.

### 2. Impact on Existing Pipelines and Their Customers

17. The proposed Eastern Extension Project will have no adverse impact on existing pipelines or their captive customers. Since the service for Piedmont represents a new market, service on other pipelines will not be displaced. Columbia Gulf had contended that it had the facilities and available capacity which could be used to transport natural gas for Piedmont. However, as previously noted, Columbia Gulf withdrew its comments based on its agreement with the finding in the EA that the Columbia Gulf system does not have access to the supply sources at the Chicago Hub and, therefore, cannot satisfy Piedmont's specific requirements and criteria.[9]

### 3. Impact on Landowners

18. The Eastern Extension Project primarily will be located along new pipeline rights-of-way, which will require that Midwestern negotiate easements with the affected landowners. Over 99 percent of the proposed route is located in open land, forest, or agricultural areas and less than one percent is located in residential areas. As of the time Midwestern filed its application, Midwestern had acquired only 32 percent of the necessary rights-of-way by voluntary agreement because of substantial landowner opposition. Only 59 percent of the landowners had granted Midwestern permission to survey their land.[10] Numerous individual landowners, as well as Sumner Trousdale

---

[8] *See* Exhibit N to Midwestern's June 6, 2005 Application.

[9] *See supra* note 4.

[10] Midwestern states that many of the landowners are waiting until final Commission certification of project before entering into rights-of-way negotiations. Midwestern's June 6, 2005 Application at 16, note 7.

Opposing Pipeline (STOP), the City of Portland (Portland), and the Sumner County Farm Bureau and the Tennessee Farm Bureau Federation (jointly, Tennessee Farm Bureau) argue that they will be adversely impacted by the Eastern Extension Project.

19. STOP, the Tennessee Farm Bureau, and many of the individual landowners argue that they object to a large, private company using eminent domain to take farmland and property for the purpose of earning large corporate profits. For example, the Tennessee Farm Bureau states that it objects to the use of eminent domain, especially by a private entity, for the taking of prime agricultural and forest lands when other alternatives may be available. Many landowners indicate that their land affected by the pipeline is not simply where they live, but that it is where they earn their livelihood and that, in some cases, the land was purchased for investment purposes. Other landowners state that they do not wish to lose land that their families have owned for generations. STOP, the Tennessee Farm Bureau, and other landowners also argue that the existence of a pipeline will have a detrimental effect on the value of the property directed impacted by, or near, the pipeline.

20. Before issuing a certificate of public convenience and necessity to a natural gas company, the Commission must find, as required by NGA section 7(c), that the project will benefit the public or be in the public interest. Under NGA section 7(h), the certificate of public convenience and necessity carries with it the right to obtain rights-of-way through the use of eminent domain, if they cannot be obtained through private negotiation.[11]

21. Under the Certificate Policy Statement, the Commission will not authorize the construction of a project, with the concomitant right to obtain the necessary rights-of-way through either negotiation or the eminent domain process, unless it first finds that the overall public (not private) benefits of the project will outweigh the potential adverse consequences.[12] As we discuss in the next section below, we find that the project provides numerous benefits that accrue to local distribution companies, Piedmont and Nashville Gas, to natural gas customers in the Nashville, Tennessee area and in North and South Carolina, and to the national natural gas transportation grid.

22. The Commission is satisfied that Midwestern has designed the proposed route to minimize the impact on landowners. Prior to filing the proposed pipeline route in its

---

[11] The courts have specifically held that the Commission may not deny the right of eminent domain to a certificate holder. *See FPC v. Tuscarora Indian Nation,* 362 U.S. 99 (1960); *Columbia Gas Transmission Corp. v. Exclusive Natural Gas Storage Easement,* 776 F.2d 125 at 129, note 1 (6th Cir. 1985).

[12] Certificate Policy Statement, 88 FERC at 61,748-50.

application, Midwestern evaluated eight route alternatives.[13] Midwestern chose the proposed route, in part, because it had the least number of affected residences compared to the other routes examined. In addition, the route traverses farmland and agricultural land, rather than residential areas. Midwestern also attempted to keep the route as short as possible. Moreover, Midwestern indicates that it agreed to extensive modifications to the proposed route to minimize impacts to landowners in response to requests of approximately 23 landowners; however, Midwestern notes that the adjustment of the pipeline route resulted in an increase of 1.9 miles to the proposed pipeline route.[14]

23. The Tennessee Farm Bureau and landowners are concerned that the pipeline will affect the future use of their land. The Tennessee Farm Bureau asserts that the proposed pipeline will deprive farmers of the economic use of their land and that the disturbance of the land from the installation of the pipeline will decrease crop yields for years and negatively impact agricultural production. It argues that a permanent 50-foot wide right-of-way, plus an additional 25 to 50-foot workspace next to the permanent right-of-way during construction, is a sizeable disruption of farmland. The Tennessee Farm Bureau also raises many questions regarding the use of the right-of-way easement by both the landowners and by the easement holders. In addition, several other commenters raised similar concerns and questions regarding future surface activities along the right-of-way.

24. Midwestern has responded that a landowner may continue to use the surface of the permanent 50-foot easement for normal tillage and agricultural purposes, such as plowing, planting and combining. This would include traversing the pipeline right-of-way with heavy equipment, such as a bulldozer, and other implements necessary for such activities. In addition to growing crops, a landowner would continue to be able to pasture livestock on the easement. Midwestern advises, though, that a landowner may not impound water, change the ground elevation of the easement, or construct or permit to be constructed any building, structure or other improvement upon the easement that would interfere with its access to the easement and the safe operation of the pipeline. Thus, to some extent, a landowner will be restrained from altering the land of the easement for farming or other activities. However, Midwestern has stated that if landowners have specialized farming operations that regularly impact the sub-soil horizons, they should so advise Midwestern so that it can be considered in the negotiation of the easement.

25. The Tennessee Farm Bureau is concerned that Midwestern's mowing activities in maintaining the right-of-way will affect farming activities within the right-of-way. Midwestern states that according to the Commission's Upland Erosion Control,

---

[13] *See* Resource Report No. 10 of Midwestern's June 6, 2005 Application.

[14] Midwestern's June 6, 2005 Application at 15-16.

Revegetation and Maintenance Plan, vegetative maintenance is not normally required in active agricultural or grazing areas, hence, there will be minimal impact to farming activities within the right-of way.

26. The Tennessee Farm Bureau also inquires whether a nursery could be located on the right-of-way. Midwestern responds that it has not identified any nursery or tree farm operations that would be crossed by the pipeline route. However, Midwestern states that it is possible that easement terms might be negotiated with landowners to allow limited nursery operations, except that trees or shrubs with deep root systems could damage the pipeline and would, therefore, be prohibited.

27. Additionally, Tennessee Farm Bureau states concern about the depth of cover over the pipeline and the circumstances in which a landowner must call before digging in the vicinity of the pipeline. Midwestern states that as provided in Section 1.61 of Resource Report No. 1, there will be at least four feet of soil over the pipeline, except in bedrock areas, where there will be two feet of cover. Midwestern adds that surface farming activities, such as plowing, planting, and combining are excluded from the Tennessee One-Call system. On the other hand, Midwestern, suggests that landowners who anticipate farming operations involving sub-soil activities raise this subject with Midwestern in easement negotiations.

28. A few commenters stated that the route of the proposed pipeline would cross or be near planned and/or potential future home sites. As discussed in the EA, Midwestern has made several minor route variations to accommodate such concerns and would continue to carefully consider possible future private residential construction plans as identified by property owners.[15] Property owners can request property-specific routing and mitigation, including compensation for lost development potential, during the right-of-way acquisition process.

29. The Commission notes that condemning private property is not in the pipeline's best interest. Generally, the condemnation process is a prolonged and expensive process that could delay construction of the pipeline and add significant costs to the project. Therefore, Midwestern has the incentive to negotiate agreements with landowners to avoid the condemnation process. In negotiations for an easement agreement, there is some flexibility to achieve minor shifts in alignment to accommodate individual landowner needs on their property. Such realignments typically do not require further Commission approval.

[15] For example, Midwestern states that it has negotiated clauses in easements to accommodate landowner's plans to install driveways across the easement. Midwestern's July 20, 2005 Answer at 10.

### 4. Balancing of Public Benefits Against Adverse Effects of Project

30. The proposed Eastern Extension Project will provide growing markets in the Nashville, Tennessee area and in the states of North and South Carolina with additional access to new sources of supply, and will assist in providing supply stability in the face of growing demand for natural gas. As stated, the Eastern Extension Project will allow Midwestern to deliver to Piedmont approximately 100,000 Dth per day of natural gas into the Columbia Gulf pipeline system near Hartsville, Tennessee, which Piedmont plans to deliver to Nashville Gas Company to meet the demand growth on the east side of Nashville's distribution system. The remaining 20,000 Dth per day of natural gas will be delivered into the East Tennessee system for delivery to Piedmont's distribution systems located in North Carolina and South Carolina.

31. The improved infrastructure associated with the project will provide supply diversity, reliability, and price competition to a region which, for years, has been largely dependent on natural gas supplies from the Gulf Coast by providing access to a new source of supply. Specifically, the Eastern Extension Project will transport through the Chicago Hub natural gas originating from multiple supply sources including Canada, the Rocky Mountains, the Permian Basin, the Mid-Continent region and, potentially, from future Alaskan and MacKenzie Delta sources, fostering new competitive alternatives among supply sources and competitive transportation options for shippers. To the extent any of the Eastern Extension Project capacity is not being used by Piedmont, it can be used by existing shippers on an interruptible or secondary firm basis.

32. Several commenters argue that the proposed project is not needed because the projected demand for natural gas in Nashville, Tennessee upon which Midwestern relies is overstated. STOP retained a consultant that found, among other things, that: (1) the Energy Information Administration's (EIA) forecast of natural gas demand growth in metro Nashville is small – only 25,000 Dth per day higher by 2025; (2) the demand forecast linked to Nashville's growth rate, while larger – 36,000 Dth per day – is still too small to drive the 120,000 Dth per day; and (3) gas usage in the northeast Nashville metro counties (Sumner, Trousdale, Wilson) is estimated to grow by less than 9,000 Dth per day by 2025.[16] The report concludes that the proposed project is not needed to meet natural gas demand growth in metro Nashville or the northeast counties.

33. One landowner, Nikki Wallace, further concludes that given that the projected need for Sumner and Trousdale Counties and surrounding areas will be only 36,000 Dth per day at the highest, 80 percent of the gas Piedmont will be transporting through the

---

[16] *See* "Alternatives to MGT's Eastern Extension Project" filed in Docket No. PF05-02.

proposed facilities will be used to benefit North and South Carolina.[17] In light of the discrepancies between the amount of capacity for which Piedmont has contracted and the demand growth projections of STOP's consultant, other commenters specifically request that Midwestern or Piedmont be required to produce validation of Piedmont's demand growth data and proof of the demand increases claimed.[18] Tennessee Senator Diane Black asserts that an independent review is required of the demand data supplied as evidence of the need for this project.[19]

34. Under the Certificate Policy Statement, contracts and precedent agreements, while not required to demonstrate that a project is required by the public convenience and necessity, are still important evidence of demand for a project.[20] Moreover, the Commission does not look behind the contracts to determine whether the customer commitments represent genuine growth in market demand.[21] Accordingly, we find that the Piedmont precedent agreement for 100 percent of the proposed capacity sufficiently demonstrates market demand and need for the project and that further investigation to determine Piedmont's specific future requirements is not warranted.

35. Second, the parties assert that the Eastern Extension Project is not needed because existing pipelines can meet Piedmont's natural gas needs. STOP, through its consultant, Mr. William W. Wade, argues that the natural gas needed by Piedmont could be supplied either by Columbia Gulf's existing system, or by backhaul arrangements using the existing systems of Tennessee Gas Pipeline Company (Tennessee) and/or East Tennessee.

---

[17] *See* letter from Nikki Wallace dated December 14, 2005 and filed on January 5, 2006.

[18] *See, e.g.*, November 16, 2005 email from intervenor Lorrie Marcum to the Commission; November 17, 2005 email from STOP Coalition members to the Commission; and January 13, 2006 letter from intervenor Lorrie Marcum to the Commission.

[19] *See* January 10, 2006 letter of Senator Diane Black requesting environmental impact study.

[20] See Certificate Policy Statement, 88 FERC at 61,748.

[21] *Id.* at 61,744. *See also NE Hub Partners, L.P.*, 90 FERC ¶ 61,142 (2000).

36. While Piedmont may have other supply and transportation options for serving its customers in Tennessee and the Carolina's,[22] it has made a business decision to purchase long-term transportation service on Midwestern because it believes access to additional, competitively priced supply sources will provide it with increased supply reliability and increased transportation reliability and flexibility, and because it values these benefits. In contracting for the subject capacity, Piedmont seeks access to natural gas supply sources connecting to the Chicago Hub not simply to have enough transportation capacity or supply to meet its growth projections, or merely to secure lower-priced gas supplies than it already has available, but to add additional sources of natural gas supply to increase supply reliability and an additional transportation alternative to increase its reliability and flexibility as a service provider. The alternatives using existing systems do not provide access to natural gas from the Chicago Hub, and therefore cannot provide Piedmont with the added supply reliability and system flexibility that the Eastern Extension Project will provide.

37. Finally, some of the affected landowners oppose the project because they will not directly benefit from the project. However, under the NGA, the Commission is charged with furthering the public interest in authorizing the construction and operation of interstate natural gas pipelines. This mission includes, among other things, the assurance of adequate supplies of natural gas to consumers, and the assurance of adequate competition among suppliers to cut costs and improve market conditions for the benefits of consumers. We find that the proposed Eastern Extension Project will foster competitive alternatives among supply sources and service providers and enhance reliability and flexibility in the national natural gas transportation grid to the benefit of all natural gas consumers.

### 5. Certificate Policy Statement Conclusion

38. As stated, Midwestern's project can proceed without subsidies and will not adversely affect or degrade service to its existing shippers. Further, the Commission finds that Midwestern's project will provide benefits that outweigh any adverse impacts arising from the lack of negotiated easements. Notably, the Midwestern's project will fill an immediate market need as evidenced by the long-term precedent agreements for 100 percent of its design capacity.

---

[22] In fact, Piedmont states that the Midwestern service complements agreements it has for firm service on Columbia Gas Transmission Company, Columbia Gulf, East Tennessee, Dominion Transmission, Hardy Storage, Tennessee, and Texas Eastern. Motion to Intervene of Piedmont at 3.

20060313-3000 Issued by FERC OSEC 03/10/2006 in Docket#: CP05-372-000



39. Moreover, the Midwestern's project will increase the reliability and flexibility of the interstate pipeline grid by offering more direct access to existing and new gas supply sources and increased availability of gas from the Chicago Hub. This should also result in more price competition, potentially lowering natural gas prices, as well. Therefore, consistent with the Policy Statement and NGA section 7, we find approval of Midwestern's proposal to be in the public convenience and necessity. We will require Midwestern to execute a contract for the level of service and for the terms of service represented in Piedmont's precedent agreement prior to commencing construction.

### B. Rate, Contract, and Tariff Issues

40. Midwestern requests authority to implement: (1) a new Rate Schedule FT-B for firm transportation service on the proposed Eastern Extension Project, and the related pro forma service agreement; (2) incremental firm and interruptible recourse rates; and (3) various tariff revisions to accommodate the new Rate Schedule FT-B service. Midwestern also requests Commission acceptance of Piedmont's Rate Schedule FT-B Precedent Agreement which contains non-conforming creditworthiness provisions. We find that Midwestern's pro forma tariff sheets containing the new Rate Schedule FT-B service and recourse rates are reasonable subject to the conditions discussed below. We also approve the non-conforming provisions contained in the Piedmont Rate Schedule FT-B Agreement.

#### 1. Incremental Recourse Rates

41. Midwestern proposes new incremental firm and interruptible recourse rates based on the cost-of-service for the new Eastern Extension. For firm incremental service under new Rate Schedule FT-B, Midwestern proposes a recourse rate that is a \$3.2854 per Dth monthly reservation charge. Midwestern proposes a zero commodity rate, since it expects no variable costs attributable to the new incremental service. Midwestern also proposes to establish an incremental rate for interruptible transportation service under the terms and conditions of its existing Rate Schedule IT. Midwestern proposes a \$0.1080 per Dth recourse rate based on a 100 percent load factor derivative of the proposed \$3.2854 monthly reservation rate.[23]

42. Midwestern calculates the proposed incremental rates based on a \$4,730,000 cost-of-service and annual design volumes of 43,800,000 Dth (or 120,000 Dth per day). The components underlying Midwestern's proposed incremental recourse rates include:

---

[23] Midwestern's currently effective firm and interruptible transportation rates on its mainline system are: \$2.06 per Dth monthly reservation charge and \$0.0009 per Dth commodity rate, and \$0.0687 maximum and \$0.0009 minimum IT rates.

(1) $26,272,000 in plant costs; (2) a 5 percent depreciation rate; and (3) a 9.38 percent overall rate of return.

43. In addition, Midwestern will assess the fuel retention and loss quantity charge currently set forth on Seventh Revised Sheet No. 5 for service on the Eastern Extension Project because it asserts that such service will require mainline compression to deliver the gas to the Eastern Extension. The currently effective in-kind fuel reimbursement is 1.00 percent of all transported volumes. Further, the ACA Surcharge, discussed below, will apply to all deliveries on the Eastern Expansion Projects' facilities.

44. Midwestern indicates that the other transportation rates under Rate Schedules FT-A, FT-GS, and IT will be additive to the proposed incremental rates for service on its new Eastern Extension Project for transactions involving the transportation of gas across Midwestern's existing certificated mainline system and the proposed Eastern Extension Project.

45. The Commission has reviewed the proposed cost of service and proposed initial recourse rates for the Eastern Extension Project and finds them reasonable. We direct Midwestern to maintain records that separately identify the costs associated with the Eastern Extension to comply with the requirements under section 154.309 of the Commission's regulations.[24] Further, if Midwestern implements any other rate or tariff changes not specifically authorized by this order or a subsequent order prior to placing the Eastern Extension facilities into service, Midwestern must file an amendment to its application under NGA section 7(c). In that filing, Midwestern must provide cost data and required exhibits supporting any revised rates. After placing the Eastern Extension facilities in service, Midwestern must submit an NGA section 4 filing to change its recourse rates to reflect any revised construction or operating costs.

### 2. Precedent Agreement, Negotiated Rates and Non-Conforming Service Agreement

46. As discussed above, Midwestern executed a precedent agreement with Piedmont, the initial shipper, for the full capacity of the Eastern Extension Project. The precedent agreement reflects a negotiated rate of $.0804/Dth, which is fixed for the term of the agreement. Piedmont elected to pay a $0.0804/Dth fixed negotiated rate under proposed

[24] See, e.g., Transcontinental Gas Pipe Line Corp., 106 FERC ¶ 61,299 at P 191 (2004).

Rate Schedule FT-B[25] subject to adjustment based upon the actual costs associated with constructing the project. Under the Precedent Agreement, if the actual cost of the Eastern Extension Project exceeds the estimated project cost, then Midwestern will increase Piedmont's negotiated rate to recover an amount equal to 50 percent of the difference between the actual cost and the estimated cost reflected in the levelized rate calculation under the precedent agreement. Conversely, if the estimated cost of the Eastern Extension Project exceeds the actual project cost, then Midwestern will reduce Piedmont's rate to reflect an amount equal to 50 percent of the difference between the estimated cost and the lower actual cost.

47. The Precedent Agreement includes an Exhibit A, the Firm Transportation Service Agreement that Midwestern states Piedmont will execute (Piedmont FT-B Agreement) prior to Midwestern's acceptance of the certificate in this proceeding. The Precedent Agreement provides for Midwestern and Piedmont to enter into a firm transportation agreement for a term of fifteen years commencing on the in-service date of the Eastern Extension Project, conditioned on the receipt of certain conditions precedent, including the receipt of necessary regulatory approvals. Midwestern also states that the Piedmont FT-B Agreement contains non-conforming language in Article 16 relating to creditworthiness requirements and financial assurances. Midwestern states these provisions are required of Piedmont to enable Midwestern to recover the cost of the Eastern Extension Project if Piedmont's Rate Schedule FT-B Agreement terminates due to non-payment or Piedmont fails to maintain creditworthiness. Article 16 provides, among other things, that the parties have agreed that the amount of damages caused to Midwestern in the event of a default would be no less than shipper's proportionate share of the cost of constructing the facilities subject to certain mitigation.

48. Midwestern states it will file, not less than 30 days prior to commencement of service: (1) an executed copy of the Piedmont FT-B Agreement; (2) a revised tariff sheet that identifies the Piedmont FT-B Agreement as a non-conforming agreement, and (3) a revised Statement of Negotiated Rates tariff sheet providing specifics of the negotiated

---

[25] Midwestern's proposed Rate Schedule FT-B provides for negotiated rates in accordance with its negotiated rate authority granted in Docket No. RP97-14-000 on October 31, 1996. *Midwestern Gas Transmission Co.*, 77 FERC ¶ 61,096 (1996); *order on compliance*, 78 FERC ¶ 61,042 (1997). Specifically, Section 5.8 of Rate Schedule FT-B provides Midwestern's customers the option to pay the recourse rates or a negotiated rate which may be less than, equal to, or greater than the cost-based maximum recourse rate.

rate in the Piedmont FT-B Agreement[26] (as well as in the Piedmont FT-A Agreement) including the name of the shipper, contract number, contract quantity, demand rate, commodity rate, primary receipt point, and primary delivery point. Midwestern also proposes to maintain separate and identifiable accounts for any quantities transported, the billing determinants, rate components, and surcharges related to its negotiated rate agreements, in sufficient detail such that negotiated rate revenues can be separately identified in any future NGA section 4 rate case. In addition, Midwestern requests that the Commission accept the Piedmont FT-B Agreement which contains the non-conforming language and negotiated rate information.

49. We find that Midwestern's proposal generally satisfies the guidelines for the filing and accounting requirements mandated in the Commission's Alternative Rate Policy Statement[27]and section 154.112(b) of the Commission's regulations regarding non-conforming service agreements. However, Midwestern's tariff filing must also state for each shipper, the applicable rate schedule for the service, the contract term beginning and ending dates, and a statement affirming that the service agreement does not deviate in any significant aspect from the related pro forma service agreement.[28] In addition, Midwestern must disclose any other agreement, understanding, negotiation, or consideration associated with the negotiated agreements.

50. We will also approve the non-conforming provisions contained in the Piedmont FT-B Agreement which will provide Midwestern with the ability to recover the cost of constructing the facilities if Piedmont defaults. The Commission has previously recognized that for new construction projects, pipelines need sufficient financial assurances from initial shippers to ensure, prior to the investment of significant resources

---

[26] Midwestern explains that it will subsequently further revise such tariff sheet to reflect the adjusted negotiated rate based upon the actual costs associated with constructing the project, and that it will file the tariff sheet six months after the in-service date of the project. *See* Midwestern's June 6, 2005 Application at 10, n.4.

[27] Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines and Regulation of Negotiated Transportation Services of Natural Gas Pipelines (Alternative Rate Policy Statement), 74 FERC ¶ 61,076 (1996), reh'g and clarification denied, 75 FERC ¶ 61,024 (1996), reh'g denied, 75 FERC ¶ 61,066 (1996); petition for review denied, Burlington Resources Oil & Gas Co. v. FERC, 172 F.3d (D.C. Cir. 1998); Modification of Negotiated Rate Policy, 104 FERC ¶ 61,134 (2003), order on reh'g and clarification, 114 FERC ¶ 61,042 (1996).

[28]Alternative Rate Policy Statement, 74 FERC at 61,241. See also NorAm Gas Transmission Co., 77 FERC ¶ 61,011 (1996).

in the project, that it can protect the financial commitment to the project.[29] We have accepted deviations from the pipeline's form of service agreement that reflect the unique circumstance involved with the construction of new infrastructure and provide the needed security to ensure that project is built.[30] The Commission has also found that it should determine issues related to financial assurances for construction projects at the certificate stage, and that such issues should not ordinarily be addressed in the pipeline's tariff.[31] We find that our approval of the proposed non-conforming provisions in the Piedmont FT-B Agreement here is consistent with these policies. However, Midwestern must still file, at least 30 days before the in-service date of the proposed facilities, an executed copy of the Piedmont Rate Schedule FT-B agreement and a revised tariff sheet to identify the Piedmont Rate Schedule FT-B Agreement as a non-conforming agreement, as it has agreed to do.

### 4. Pro Forma Tariff Changes

51. Midwestern proposes pro forma tariff provisions primarily to include the new Rate Schedule FT-B for firm service on the Eastern Extension, a related FT-B pro forma service agreement, and numerous edits to its remaining transportation rate schedules and the General Terms and Conditions (GT&C) to accommodate the new FT-B service. The pro forma Rate Schedule FT-B and related form of service agreement track the provisions under Midwestern's Rate Schedule FT-A for firm service on its existing system. The remaining pro forma tariff sheets reflect changes to various other rate schedules and GT&C to accommodate the new FT-B service. Such changes affect Rate Schedules IT and LMS-MA (for balancing service), service requests, credit evaluation, contract execution, gas quality monitoring, scheduling, point rights, segmentation rights, capacity releases, and nomination procedures.

52. We find that Midwestern's pro forma tariff changes generally comply with Part 284 of the Commission's regulations and current Commission policy, with two exceptions. First, Midwestern must revise the preliminary statement of its tariff to include the Eastern Extension Project.[32] Second, Pro Forma Sheet No. 5 reflects a

---

[29] See, e.g., PG&E Gas Transmission, Northwest Corp., 105 FERC ¶ 61,382 at P 23 (2003); Policy Statement on Creditworthiness for Interstate Natural Gas Pipelines and Order Withdrawing Rulemaking Proceeding (Policy Statement on Creditworthiness), FERC Stats. and Regs. ¶ 31,191at P17 (June 30, 2005).

[30] CenterPoint Energy Gas Transmission Co., 102 FERC ¶ 61,222 (2003).

[31] See, e.g., North Baja Pipeline, LLC, 102 FERC ¶ 61,234 at P 15 (2003); Policy Statement on Creditworthiness at P 18.

[32] *See* 18 C.F.R. §154.105 (2005).

$0.0019 per Dth FERC Annual Charge Adjustment (ACA). Since filing its application, the Commission approved Midwestern's filing in Docket No. RP05-562-000 to decrease its ACA from $0.0019 to $0.0018 per Dth for the current fiscal year beginning October 1, 2005. Accordingly, Midwestern must reflect this decrease when it files its actual tariff sheets. In addition, Midwestern must make a corresponding change to footnote No. 5 of Pro Forma Sheet No. 5 stating the maximum volumetric firm rate for capacity release, which includes the ACA charge. Midwestern must make these changes when it files its actual tariff sheets at least 30 days, but no more than 60 days, prior to commencing service on its new Eastern Extension.

### C. Environmental Analysis

53. Midwestern used the Commission's National Environmental Policy Act of 1969 (NEPA) Pre-Filing Process for its expansion project.[33] The purpose of using the Pre-Filing Process is to involve interested stakeholders early in the project planning and to identify and resolve issues prior to filing the certificate application. This allowed more than seven months of stakeholder input prior to Midwestern's filing its application on June 6, 2005.

54. On January 21, 2005, the Commission issued its Notice of Intent to Prepare an Environmental Assessment for the Proposed MGT Eastern Extension Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meeting (NOI). In addition, Commission staff held a public scoping meeting and a public site visit for the project, on February 24, 2005 and April 26, 2005, respectively.

55. Approximately 60 comments were received during the scoping period, including comments made at the public scoping meeting and the filed written comments. The complete record of the pre-filing Docket No. PF05-2-000 has been received into and integrated with the record of this docket. An additional 31 comments were received in Docket No. CP05-372-000 from property owners and STOP.

56. On October 20, 2005, the Commission issued the EA for Midwestern's proposed project, with comments due on November 21, 2005. The EA addressed geology and soils, water resources, wetlands, vegetation and wildlife, threatened and endangered species, land use, cultural resources, socioeconomics, air quality and noise, safety and reliability, and alternatives. The EA also addressed all substantive comments received in

---

[33] Docket No. PR05-2-000 was established on October 27, 2004 for Midwestern's pre-filing proceeding.

response to the NOI and the comments related to the environmental aspect of the proposed project filed in Docket No. CP05-372-000.

57. Comments to the EA were filed by the U.S. Fish and Wildlife Service (FWS), the Tennessee Historical Commission (Tennessee SHPO), the Tennessee Wildlife Resources Agency (WRA), Portland, STOP, eleven affected property owners, Barry Sulkin, and Gregory Buppert.[34] Based on the discussion in the EA, the Commission concludes that if constructed in accordance with Midwestern's application and supplements, and in accordance with the mitigation measures listed in Appendix B, approval of the proposed project would not constitute a major federal action significantly affecting the quality of the human environment.

### 1. Environmental Impact Statement

58. Several commenters contend that the proposed project is a major federal action significantly affecting the quality of the human environment and requires a comprehensive environmental impact statement (EIS). Mr. Sulkin asserts that from his work with the local residents it is clear that the proposed project is highly controversial, far from insignificant, and requires the more in-depth EIS as required by NEPA. Mr. Buppert argues, in addition to the highly controversial nature of this project, an EIS is needed to address the unique characteristics of the karstic[35] nature of the area in which the proposed pipeline is located.

59. An EA is a concise public document for which a federal agency is responsible that serves to provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.[36] As stated, the EA addressed geology and soils, water resources, wetlands, vegetation and wildlife, threatened and endangered species, land use, cultural resources, socioeconomics, air quality and noise, safety and reliability, and alternatives. The EA also specifically addressed numerous issues related to potential for karst development, including issues related to potential impacts from blasting, sinkholes, caves, and springs, which are also addressed below.

---

[34] Mr. Sulkin's and Mr. Buppert's comments were filed by Bullock, Fly and Hornsby, attorneys representing STOP.

[35] Karst is an area of irregular limestone in which erosion has produced fissures, sinkholes, underground streams, and caverns.

[36] *See* 40 C.F.R. § 1508.9 (2005).

60. While the existence of a public controversy over the effect of an agency action is one factor in determining whether the agency should prepare an EIS,[37] a federal action "is controversial if a substantial dispute exists as to [its] size, nature or effect. The existence of opposition to a use, however, does not render an action controversial."[38] A substantial portion of the objections raised are to the project itself, and not the environmental impacts. As discussed in the EA and below, the Commission has determined that the impacts associated with this project can be sufficiently mitigated to support a finding of no significant impact.

### 2. Incomplete Environmental Review

61. In opposing the proposed project, many property owners have been unwilling to provide Midwestern with information regarding their properties or have limited or denied Midwestern access to their properties. The EA noted that "due to the lack of access to parcels along the pipeline route, [Midwestern] has not completed the civil and environmental surveys of the entire route."[39] As a result, several commenters question how the Commission could issue an EA when Midwestern has only had access to survey approximately half of the pipeline right-of-way.

62. Landowners cannot deny access to their property and then use this as a basis for claiming that the Commission's NEPA analysis is insufficient because all studies have not been completed. The EA analyzes the impact the proposed project will have on the environment and develops mitigation measures to address areas of concern, such as, among other things, the impact construction and blasting will have on the karst terrain. However, where access to property has been denied, the EA is not the end of the analysis of the proposed project. In such circumstances, as in this case, the Commission will require additional field investigations, surveys, studies, and plans. For example, Environmental Condition 12 of this order requires that Midwestern complete karst field surveys on all parcels crossed by the project that were previously inaccessible, while Environmental Condition 16 requires Midwestern to conduct surveys for federally listed species along those segments of the route that were previously inaccessible. In addition,

---

[37] 40 C.F.R. § 1508.27(b)(4) (2005).

[38] *Wetlands Action Network v. United States Army Corps of Eng'rs*, 222 F.3d 1105, 1121 (9th Cir. 2000) (citation omitted). *See also, LaFlamme v. FERC*, 852 F2d. 389, 400-401 (9th Cir. 1988).

[39] EA at 16.

Midwestern has stated that it will complete all civil and environmental surveys, including its karst field survey, prior to construction.[40]

63. Once Midwestern completes all the necessary studies, the Commission reviews this information before issuing authorization to commence construction. If any of the final surveys raise issues that warrant additional environmental review, the Commission's staff will conduct that review before Midwestern is granted clearance to commence construction. Further, these post-certificate activities typically result in additional site-specific mitigation measures to further reduce the impact of the proposed project.

### 3. <u>Karst Terrain</u>

64. The proposed route passes over terrain underlain, in part, by carbonate rocks (limestone and dolomite). Carbonate rocks are the basis for karst terrain which is characterized by sinkholes, caves, and conduit-flow springs.[41] The EA discusses the karst terrain and its potential impact on the proposed project.[42] Karst development can potentially impact local wells and springs along the proposed pipeline route. The EA also analyzes the impact construction of the proposed pipeline on local wells and springs.[43]

65. Mr. Buppert contends the unique characteristics of the karst landscape create unknown risks that require that the Commission prepare an EIS for the proposed project. Other commenters contend that the EA does not adequately identify and address all potential caves and other issues related to the karst landscape because all the land was not surveyed. Mr. Sulkin contends that the EA is incomplete because there is little mention of the documentation and maps that he has provided with the location of wells and springs on individual properties. He argues that the potential impacts to individual wells and springs has been dismissed as a minor issue not worthy of an EIS, based on incomplete inventory and a provision that Midwestern will conduct pre- and post-construction well monitoring. He states that an EIS is needed to fully evaluate all area well and spring locations to more accurately assess potential impacts and alternative routing needs. The City of Portland is concerned that the pipeline may impact the city's water supply. STOP and several landowners raise similar issues.

---

[40] Midwestern's December 6, 2005 Supplemental Comments to the EA at 2-3.

[41] A conduit-flow spring is a subsurface passage that fills with water under hydrostatic pressure and eventually breaks the surface forming a spring.

[42] EA at 13-17.

[43] *Id.* at 20-24.

66. Midwestern engaged P.E. LaMoreaux & Associates Inc. (PELA) to investigate and assess the karstic nature of the pipeline route and to propose appropriate Best Management Practices (BMP's) for construction to minimize environmental impacts.[44] The study reviewed the relevant features identified on topographic and geologic quadrangle maps located within a twomilewide corridor centered on the pipeline.[45] PELA then conducted a review of The Tennessee Cave Survey files for known caves in the area, their size, and areal extent. No caves were previously recorded along the proposed pipeline corridor. PELA also conducted a reconnaissance of the proposed route by helicopter, road, and on foot where access to property was available. Although scoping comments identified that certain properties contain caves, survey permission has not been granted to those properties and these caves were not evaluated on the ground. To evaluate the potential impacts the proposed project would have on wells and springs, PELA obtained well data from the Tennessee DEC Water Quality Division for a four mile wide corridor.

67. PELA developed a karst hazard assessment which evaluated all of the components of the investigation. The sensitivity of any local aquifers to groundwater impacts due to their karstic characteristics was divided into three levels: high, moderate, and low depending on the degree of karst development and the potential for project impact on the karst and the groundwater in a given area. The PELA study of the proposed route indicated that about 21.8 miles (70.6 percent) of the corridor has no or few karstic features. These sections have been determined to have low sensitivity to karst and groundwater problems, and construction impacts would be unlikely. The remaining 9.1 miles (29.4 percent) were classified as moderately sensitive to construction impacts. There were no areas along the proposed pipeline route that PELA determined to have a high potential for impact.

68. Based on the available information, the report concludes, on a segment-by-segment analysis of the pipeline route, that none of the segments were judged to have a high susceptibility to impact. However, as noted, due to current landowner restriction, PELA personnel could not view portions of the route from the ground, and arrived at its conclusion based on an aerial assessment of those areas.

---

[44] PELA states that it is nationally and internationally recognized as a karst specialist that performs investigations and evaluations for sinkhole risk assessments, source water delineation for karsts pings and wells, karst hydrology and geology.

[45] The report states that if the review indicated that there were potentially larger karst groundwater basins extending beyond two miles, it would have increased the area under review. However, the review of maps did not indicate a need to expand the area of review.

69. Based on the completed surveys, the analysis in the EA, and the recommended Karst BMP's related to pipeline construction,[46] we conclude that there is sufficient evidence to support a finding that the proposed project will have no significant impact on the environment. However, Midwestern's certificate authorization requires that Midwestern complete the karst field surveys on all lands that were previously inaccessible and file the results of the surveys for approval prior to construction.[47]

70. If a landowner or Mr. Sulkin has specific information concerning individual properties that should be considered during these surveys, they should make that information available to Midwestern. If the Commission determines that further environmental review is warranted as a result of the additional surveys, it will conduct that review prior to authorizing construction of the proposed pipeline. Midwestern is also required to have a qualified geologist on call during construction to plan and review construction methods and to provide technical support to mitigate or to avoid any potential sinkhole locations and karst-related issues that may arise during construction.

71. In response to Portland's concerns about the potential impact the proposed project would have on its water treatment plant, Midwestern states that it will coordinate with the Tennessee Division of Water Supply's Field Office Manager and Portland during its planning and construction to ensure that drinking water is not affected during construction of the pipeline. Accordingly, we will require Midwestern to consult with Portland and its consultants to develop a site-specific construction plan for project activity near Portland's water treatment facilities for review before it commences construction.[48]

### 4. <u>Blasting</u>

72. The EA states that blasting may be necessary in the areas of shallow bedrock along the proposed pipeline route.[49] Due to lack of access to many properties along the pipeline route, Midwestern used the National Cooperative Soil Survey to estimate the locations where blasting may be necessary. If bedrock is encountered, Midwestern would determine the technique for removal depending on the strength and hardness of the rock. Attempts would be made to use mechanical rippers or other mechanical means to remove bedrock encountered in the trench. If blasting is required, Midwestern would conduct it

---

[46] *See* PELA report at 10-11.

[47] Environmental Conditions 12 and 13.

[48] Environmental Condition 19.

[49] EA at 16-17.

in accordance with established guidelines designed to control energy propagation and to protect persons and property in the area. The EA also determines that with the use of appropriate blasting techniques, rock fracturing should only occur on the right-of-way, and, therefore, it is unlikely that groundwater systems located outside the construction right-of-way would be adversely affected.[50]

73. Many commenters are concerned with the potential impacts of blasting in the vicinity of wells and springs and would prefer that a technique such as a rock trencher be used. They also inquire about the specialized construction techniques that would be implemented to minimize impacts on groundwater resources in areas where blasting may be required. Veit Spero notes that the EA recommends that groundwater resources be monitored within 150 feet of the proposed pipeline during construction, but believes that monitoring should be expanded to at least 0.5 mile. Mr. Sulkin is concerned that stream flow will be lost due to blasting. Other commenters request that the Commission explain what would happen if monitoring determines that the blasting has impacted the water supply.

74. As stated, Midwestern will primarily use mechanical rippers or other mechanical means to remove bedrock encountered in the trench. However, if blasting is necessary, it may increase the fracturing within bedrock in the vicinity of the trench but would not be expected to alter the general fracture patterns or extent of fracturing within the aquifer system.[51] Moreover, because the trench excavation would be relatively shallow and Midwestern would use low-velocity charges, the properly placed and sized charges would not be expected to create disturbances beyond about 10 feet laterally from or several feet below the blast site.[52]

75. The use of proposed mitigation measures, including the use of minimum or delayed charges, blasting mats, and other mitigation techniques to prevent rock fragments from damaging surface areas or blocking streams, would minimize the overall impact of blasting on wells and springs and would be temporary and minor. Environmental Condition 15 requires that Midwestern prepare construction and mitigation plans that

---

[50] *Id.* at 22.

[51] *See* Siskind, David E., and Robert R. Fumanti, *Blast-Produced Fractures in Lithonia Granite*, (International Society of Explosive Engineers, Technical Document RI 7901, 1979).

[52] Studies indicates that specific blasting techniques can control fracturing in rock such that significant impacts to not occur beyond 10 to 20 feet from the blast site. *See* Oriard, L.L., *Vibration and Ground Rupture Criteria for Buried Pipelines,* (International Society of Explosive Engineers, 1994 General Proceedings P 243).

would identify the streambed rock type, state whether or not blasting would be required, and describe the measures Midwestern would implement to ensure its construction does not cause a loss of stream hydrology. The Commission will review Midwestern's plan prior to granting permission to construct the facilities. If further surveys and studies warrant further environmental analysis, the Commission will also conduct that analysis prior to granting permission to construct the facilities.

76. To further reduce impacts, Environmental Conditions 13 and 14 require that Midwestern conduct pre- and post-construction monitoring of yield and water quality for wells and springs within 150 feet of the construction work areas, and to file a report discussing whether any complaints were received regarding yield or water quality. If post-construction monitoring determines that construction has impacted yield and water quality of the wells and springs, Midwestern will be required to mitigate the impact.

77. Finally, based on studies that indicate that specific blasting techniques can control fracturing in rock, such that significant impacts to not occur beyond 10 to 20 feet from the blast site, and previous experience on previous pipeline projects in similar geographic areas[53], the Commission believes monitoring within 150 feet of the construction work areas is sufficient.

### 5. <u>Streams and Wetlands</u>

78. The EA states that Midwestern's project would cross 94 surface waterbodies, which are identified as perennial, intermittent, and as wet weather conveyances based on U.S. Geological Survey (USGA) mapping.[54] Wetland areas were determined by field delineation surveys using the United States Army Crops of Engineers' (COE) 1987 Wetland Delineation Manual and through review of National Inventory Maps for restricted access areas. Midwestern's proposed action includes use of the Commission's "Wetland and Waterbody Construction and Mitigation Procedures" (Procedures) to ensure adequate protection of the resources during and after construction.

79. STOP indicates that wetland mapping used in the EA may be decades old, and that up-to-date information must be used in making such an important decision as allowing Midwestern to proceed with the project. Tennessee WRA states that the COE and the Tennessee Department of Environment and Conservation (DEC) should be consulted for wetland determinations when access is obtained in the non-surveyed areas since they have the legal authority to make these delineations. Also, the Tennessee WRA states that

---

[53] Id.

[54] EA at 24. Steams identified by field assessment and USGA mapping and aerial photos for restricted access areas.

there is no mention of compensatory mitigation for wetland impacts as required by the State of Tennessee. Tennessee WRA also requests a 50-foot vegetated buffer on the right-of-way easement at all stream crossings instead of the minimum 25-foot vegetated buffer required by the Commission.

80. Mr. Sulkin questions the list of required permits in the EA. Specifically, he states that the Tennessee DEC would issue the permit for the Clean Water Act and if construction is permitted, the storm water permit should be issued as an individual permit with site-specific requirements, rather than the weak general permit usually allowed. Mr. Sulkin also states Tennessee has chosen to ignore the preventive aspects of section 303(d) of the Clean Water Act that requires individual states to develop a list of surface waters that do not meet state water quality standards or do not support their designated uses. He contends that the Commission should assure that all waters correctly covered by the provisions of 303(d) are given protection and prevented from becoming degraded.

81. Prior to construction, Midwestern will conduct field delineations of all streams and wetlands along the pipeline route in consultation and accordance with the Tennessee DEC and COE requirements. It also needs to comply with and secure all the necessary permits from those agencies, including Clean Water Act compliance and permits. Both the Tennessee DEC and the COE, through their respective permitting authorities, can require more stringent mitigation measures, or compensatory mitigation, as necessary. While final engineering and alignment survey will more accurately delineate the boundaries of each waterbody and wetland that is crossed, they will not change the project-related aspects of the project described in the EA.

82. While Midwestern is required to comply with state and local permitting, we note, however, any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate. The Commission encourages cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[55] Moreover, issues concerning state and local permits are outside of the Commission jurisdiction. Mr. Sulkin should raise his concern about the storm water permit with the Tennessee DEC.

---

[55] See, e.g., Schneidewind v. ANR Pipeline Co., 485 U.S. 293 (1988); National Fuel Gas Supply v. Public Service Commission, 894 F.2d 571 (2d Cir. 1990); and Iroquois Gas Transmission System, L.P., 52 FERC ¶ 61,091 (1990) and 59 FERC ¶ 61,094 (1992).

### 6. Alternatives

83. The EA evaluated three system alternatives and seven major route alternatives.[56] The system alternatives included capacity on Columbia Gulf and backhaul arrangements on Tennessee Gas and East Tennessee. The major route alternatives included three alternate routes analyzed to specifically address public comments. The EA concluded that Piedmont's specific project objectives could not reasonably be attained by use of existing pipeline facilities and that none of the major route alternatives had a significant environmental advantage over the proposed project.

84. Mr. Buppert contends that the EA's alternatives analysis was cursory and inadequate to carefully evaluate the costs and benefits of other pipeline alternatives. Specifically, Mr. Buppert states that the Commission did not explore complex technical questions regarding existing pipeline capacity and improperly relied on the stated objective of Piedmont to increase the reliability and flexibility in the pipeline grid. The EA's criteria for evaluating alternatives were: (1) technical and economic feasibility and practicality; (2) significant environmental advantage over the proposed project; and (3) achievement of the project objectives of providing a capacity of 120,000 Dth per day for Piedmont to meet its growth projections and providing access to gas sourced from the Chicago Hub.

85. The EA concluded that the specific objectives of Midwestern's proposed project to provide service for Piedmont cannot reasonably be attained by use of existing pipeline facilities.[57] When Piedmont and Midwestern were in negotiations, transportation on Columbia Gulf was not an option because it did not have the capacity available to transport the additional volumes of gas for Piedmont. Nor does the Columbia Gulf system have access to the Chicago Hub and the supply sources there.[58] The other system alternatives would require expansion of either East Tennessee's or Tennessee Gas' system

---

[56] EA at 64-74.

[57] The three system alternatives analyzed by the EA were (1) the delivery of gas by Columbia Gulf from its sources in the Gulf of Mexico to Nashville Gas Company and to Columbia Gulf's interconnect with East Tennessee Gas near Hartsville, Tennessee; (2) delivery of gas at Portland, Tennessee by Midwestern to Tennessee Gas, which would deliver an equivalent volumes to East Tennessee at an existing interconnect near Ridgetop, Tennessee for transport to the Hartsville area and/or an existing Lobelville interconnect, and (3) delivery of gas at Portland by Midwestern to Tennessee Gas, which would deliver equivalent volumes to Nashville Gas at an existing interconnect near Nashville.

[58] EA at 65.

to accommodate the incremental volumes required by Piedmont.[59] In view of these considerations, there was no basis to support a finding that any of the three system alternatives were technically or economically feasible and practical. Therefore, we do not agree with Mr. Buppert that the EA's alternatives analysis was inadequate. Further, the EA explained that, even assuming that expansion of either the East Tennessee or Tennessee Gas system would be feasible, expansion of those systems would not secure the benefit of an increase in reliability and flexibility in the natural gas transportation grid resulting from an additional transportation alternative and associated interconnects, a key Piedmont objective.[60] The EA further explained that the Tennessee Gas alternative also would not meet the objective for the incremental volumes of natural gas to reach Piedmont's distribution systems in North and South Carolina.[61] While Mr. Buppert asserts that the EA improperly relied on Midwestern's and Piedmont's objectives, the courts have upheld federal agencies' use of applicants' identified objectives as the basis for evaluating alternatives.[62]

86. The EA also concluded that Midwestern's proposed route was environmentally preferable to five of the seven route alternatives that were studied.[63] In addition, the EA found that two other alternative routes which would require use of Tennessee Valley Authority (TVA) powerline easements had no apparent environmental advantage over Midwestern's proposed route.[64] Mr. Spero states that the Commission should reevaluate these alternative routes and work with the TVA and use the existing unused TVA right-of-way easement that crosses Sumner County. As discussed in the EA, the alternatives using the existing TVA rights-of-way will generally be longer and result in more environmental impacts than the proposed project.[65] More importantly, the TVA advised Midwestern it would be acquiring its easements subject to the existing rights of the TVA and that Midwestern would have no permanent right to a location on the powerline

---

[59] EA at 66-67.

[60] EA at 66-67.

[61] EA at 67.

[62] See, e.g., City of Grapevine, Texas v. DOT, 17 F.3d 1502, 1506 (D.C. Cir. 1993), citing Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 197-98 (D.C. Cir. 1991).

[63] EA at 67-73.

[64] EA at 73-74.

[65] EA at 73-74.

easement. That is, if the TVA determined that the pipeline interfered in any way with its existing or future facilities, Midwestern would be required to relocate the pipeline on the TVA powerline easement or move all or part of the pipeline off the TVA easement, resulting in future disruption and impact to landowners. Thus, a reevaluation of these alternatives is not warranted.

### 7. Soil, Restoration, and Maintenance Issues

87. Pipeline construction could affect soils within the proposed construction right-of-way in several ways, including erosion, compaction, loss of productivity, establishment of noxious weeds, and contamination of leaking equipment. The EA discusses each of these issues and determines that for the most part, these impacts are short-term and are limited primarily to the construction phase of the project.[66]

88. Several commenters reiterate concerns about the impact of the pipeline's construction affecting soils, including erosion, compaction, loss of productivity, establishment of noxious weeds, contamination from leaking equipment, and restoration. Commenters express concern that the pipeline would destroy farmland or prevent continued farming of the land. Mr. Spero asks that Commission require Midwestern to mow the right-of-way three times per year in agricultural areas to control the proliferation of weeds and to consult with the landowner for the appropriate seed mixes and soils to restore disturbed areas.

89. Midwestern will restore and revegetate all disturbed areas by following the Commission's Upland Erosion Control, Revegetation, and Maintenance Plan. As more fully discussed in the EA,[67] Midwestern will segregate top soil and restore it following construction to minimize impacts to agricultural land and/or prime farmland soils. Cultivated fields and pastures would be allowed to continue over the permanent right-of-way. This will minimize impact on soils to the maximum extent possible.

90. After construction, no restrictions would be placed on the temporary right-of-way or extra workspaces. Property owners will be able to access the property and cross over the pipeline at any location along their property. Operation of heavy farm equipment over the pipeline for the purpose of normal cultivation could continue. During easement negotiations, property owners can request that specific mitigation and restoration measures be implemented based on their particular concerns for their properties.

---

[66] EA at 17-19.

[67] *Id.*

91. Pipeline rights-of-way in croplands that are actively cultivated are not routinely maintained and mowed by the pipeline. However, Midwestern would be responsible for monitoring the revegetation success in agricultural areas, including crop yields.[68] Revegetation is considered successful if crop yields are similar to adjacent undisturbed portions of the field. If property owners have concerns with the proliferation of weeds, Midwestern will monitor these areas and mitigate as necessary.

### 8. Endangered Species

92. The FWS, Tennessee Field Office states that "upon review of the [EA] submitted on October 25, 2005, we concur that the proposed Eastern Extension Project is not likely to adversely affect the leafy prairie clover, provided that the project is implanted in accordance with the protective measures contained in the assessment." In addition, the FWS recommends that Midwestern provide copies of all surveys conducted for the leafy prairie clover, a federally-listed species, to the Tennessee Field Office for its review when access is granted to Midwestern.

93. As stated, *supra*, Environmental Condition 16 of this order requires Midwestern to complete its surveys for federally listed species on properties that were previously inaccessible. Midwestern must coordinate with the FWS biologists to ensure that the survey methodology and timings are adequate, and submit the survey results to the appropriate FWS office. Midwestern would not be allowed to begin construction of the project until: (1) comments from the FWS are filed regarding the proposed action; (2) the Commission staff completes any required informal or formal consultation with the FWS; and (3) Midwestern has received written notification from the Director of the Office of Energy Projects that construction may proceed.

### 9. Timber/Brush Disposal

94. The EA states that timber cut from the right-of-way would be disposed of by: (a) stacking along the edge of the right-of-way with landowner approval; (b) chipping slash or brush and leaving the chips on the right-of-way; (c) burying, except in wetlands or agricultural areas; (d) burning, unless specifically prohibited in the area; and/or (e) offsite disposal in an approved area. Several commenters raised concern about burning brush and timber disposal. Midwestern is required to follow all local ordinances in disposing of brush and timber. If particular landowneshave a preference regarding how the brush and timber on their property is disposed of, they should request that method during easement negotiations.

---

[68] *See* Commission's Upland Erosion Control, Revegetation and Maintenance Plan, Post-Construction Activities, Monitoring and Maintenance, section VII.A.2.

### 10. Environmental Inspectors

95. Environmental Condition 7 requires that Midwestern employ at lease one environmental inspector per construction spread. Ronnie Briley requests information concerning who employs the environmental inspector. The Commission requires that Midwestern hire full-time environmental inspectors to monitor construction and to ensure compliance with all mitigation measures. The environmental inspectors are responsible for independently evaluating the construction contractor's implementation of the environmental mitigation measures.

96. Environmental inspectors have the authority to stop activities that violate the environmental conditions of a certificate, state and federal permit conditions, or landowner requirements. The inspectors identify, document and oversee corrective actions, as necessary to bring an activity back into compliance. Commission staff also conducts periodic field inspections during construction and restoration of the pipeline right-of-way to ensure compliance with the Commission's order. Midwestern will be held accountable for any violations.

### 11. Right-of-Way Issues

97. The EA states that construction access to the project generally would occur via the construction right-of-way and existing public and private road network.[69] One commenter requests clarification that heavy equipment should be restricted to the right-of-way. All construction activities will occur in the right-of-way and approved work areas. Project-related equipment is restricted to approved access roads and the right-of-way.

### 12. Cattle

98. A large portion of the proposed facilities will go through active agricultural areas, fallow fields, and pasture. Several commenters have expressed concern that cattle could fall into the pipeline trench during construction, and that construction would prevent cattle from moving to drink water. Also, several commenters are concerned that construction activities will impact the spring from which they water their cattle and that the noise from construction activities could adversely affect cattle and calves.

99. Midwestern will install temporary fencing along the construction right-of-way to keep cattle out of the trench area and construct temporary bridges, or earthen plugs in the trench to allow cattle to cross the right-of-way during construction. While noise levels vary at any given location as construction progresses along the right-of-way, temporary

---

[69] EA at 9.

fenced areas may be used to mitigate impact of construction noise on cattle. Moreover, Midwestern has an obligation to compensate property owners for damages caused by the construction of the pipeline, which may include damages to cattle. Midwestern will coordinate with property owners during easement negotiations to identify areas actively used for grazing, drinking, or actively accessed by cattle and implement mutually acceptable means to accommodate the cattle during construction.

### 13. Forest Fragmentation

100. The EA states that forest fragmentation can contribute to an overall decline in the suitability of the habitat to provide good foraging and nesting for certain bird and mammal species.[70] STOP states that one registered forest consists of 29 acres and is surrounded on three sides by more forest. It requests a definition of forest fragmentation. Forest fragmentation is the process whereby a large patch of forest is broken down into smaller patches of forest, usually due to development of the land. The EA indicates that that forest in the project area is already highly fragmented due to development and agriculture and concludes that operation of the project would have relatively little effect on wildlife.

### 14. Trespass and Emotional Distress

101. Several commenters raise issues concerning Midwestern's agents trespassing on their property. Matters of trespass are mainly of local concern; if Midwestern's representatives are trespassing on property without permission, the affected persons should notify their local authorities.[71]

102. In addition, a few commenters were concerned that the human aspects of the property owners affected by the project, including fear, stress, and mental anguish were not addressed in the EA. The U.S. Supreme Court has determined that "if a harm does not have a sufficiently close connection to the physical environment, NEPA does not apply."[72] In part, the Court based its decision on the difficulty in determining "the differences between someone who dislikes a government decision so much that he suffers anxiety and stress, someone who fears the effects of that decision so much that he suffers similar anxiety and stress, and someone who suffers anxiety and stress that 'flow directly'

---

[70] *Id.* at 35.

[71] See Guardian Pipeline, LLC, 94 FERC ¶ 61,269 (2001); East Tennessee Natural Gas Company, 102 FERC ¶ 61,225 (2003).

[72] Metropolitan Edison v. People Against Nuclear Energy, 460 U.S. 766 at 779 (1983).

. . . from the risks associated with the same decision."[73] Accordingly, the Court found agencies are not obliged to undertake such an inquiry.[74]

### 15. Environmental Conclusion

103. As stated, based on the discussion in the EA and above the Commission has determined that if constructed in accordance with Midwestern's application and supplements, and in accordance with the mitigation measures listed in the Appendix B, approval of the proposed project would not constitute a major federal action significantly affecting the quality of the human environment.

104. Midwestern shall notify the Commission's environmental staff by telephone or facsimile of any environmental noncompliance identified by other Federal, state, or local agencies on the same day that such agency notifies Midwestern. Midwestern shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

### D. Conclusion

105. For the reasons set forth herein we find, subject to the conditions discussed in the body of this order and listed below, that the public convenience and necessity requires issuance of a certificate under NGA section 7(c) for Midwestern's proposed pipeline facilities. Thus, we grant the requested authorization to Midwestern.

106. The Commission on its own motion, received and made a part of the record all evidence, including the application, amendment, and exhibits thereto, submitted in this proceeding, and upon consideration of the record,

The Commission orders:

(A) A certificate of public convenience and necessity is issued to Midwestern in Docket No. CP05-372-000 authorizing it to construct and operate the Eastern Extension Project, as described and conditioned herein, and as more fully described in the application.

(B) The authorization in Ordering Paragraph (A) is conditioned on Midwestern's compliance with all applicable Commission regulations under the Natural

---

[73] *Id.* at 777-778.

[74] *Id.* at 778.

Gas Act, particularly Part 154 and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations.

(C) The certificate issued in Ordering Paragraph (A) is conditioned upon Midwestern's compliance with the environmental conditions set forth in Appendix B of this order.

(D) Midwestern shall complete the authorized construction within one year of the final order in this proceeding.

(E) Midwestern must file an executed copy of the Piedmont FT-B Agreement and a revised tariff sheet to reflect the non-conforming agreement not less than 30 days prior to commencement of service on the new Eastern Extension Project.

(F) Midwestern must file actual tariff sheets at least 30 days, but no more than 60 days, prior to placing the Eastern Extension Project facilities in service, with the revisions specified in the body of this order.

(G) After placing the Eastern Extension Project into service, Midwestern must make an NGA section 4 filing to change its rates to reflect any revised construction costs or operating costs.

(H) Midwestern shall maintain separate books, accounts, and records for transportation provided at negotiated rates and for transportation provided at cost-based rates under Rate Schedule FT-B.

(I) Midwestern's answer is accepted into the record.

(J) Midwestern shall notify the Commission's environmental staff by telephone and/or facsimile of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Midwestern. Midwestern shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

By the Commission.

( S E A L )

Magalie R. Salas,
Secretary.

## Appendix A

### Interventions

Columbia Gulf Transmission Co.
East Tennessee Group
Hodges, Billie
Hodges, Harold Steven
Marcum, Lorrie
Nicor Gas
Portland, Tennessee, City of
Piedmont Natural Gas Co., Inc.
ProLiance Energy
Sumner-Trousdale Oppose Pipeline

### Comments

Anderson, Paul
Ashe, Joseph R.
Baker, Jean
Bass, Frank A. and Mary A.
Black, Diane, State Senator, 18th District
Bredesen, Phil, Governor, Tennessee
Briley, Ronnie
Bullock, Fly, and Hornsby
Carr, Sue
Carter, Charles
Deshler, Martha A.
Deshler, Charles A.
Dye, James W
Eastern Band of Cherokee Indians
Fenimore, Martha Jo Law
Fowler, David
Georgiades, Wayne (Doc)
Hodges, Billie
Hodges, Harold S.
Kirkham, Calvin and Wanda
Law, Robert
Marcum, Lorrie
Mitchell, Jodi
Palmer, Jean
Perry, Bonita J.
Roddy, Linda
Roddy, Ronald
Savely, Harlan
Spero, Veit
Stephenson, James E.
Tennessee Farm Bureau Federation
Tennessee Historical Commission
Tennessee Wildlife Resources Agency
Wallace, Alexis
Wallace, Nikki
Ward, Jackie
Webster, Linda
Whitman, Arlin
Woodward, Bill

## Appendix B

As recommended in the EA, this authorization includes the following conditions:

1. Midwestern shall follow the construction procedures and mitigation measures described in its application and supplements (including responses to a staff data request) and as identified in the environmental assessment (EA), unless modified by this Order. Midwestern must:

   a. request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);
   b. justify each modification relative to site-specific conditions;
   c. explain how that modification provides an equal or greater level of environmental protection than the original measure; and
   d. receive approval in writing from the Director of the Office of Energy Projects (OEP) **before using that modification.**

2. The Director of OEP has delegation authority to take whatever steps are necessary to ensure the protection of all environmental resources during construction and operation of the project. This authority shall allow:

   a. the modification of conditions of this Order; and
   b. the design and implementation of any additional measures deemed necessary (including stop work authority) to assure continued compliance with the intent of the environmental conditions as well as the avoidance or mitigation of adverse environmental impact resulting from project construction and operation.

3. **Prior to any construction,** Midwestern shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors, and contractor personnel will be informed of the environmental inspector's authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction and restoration activities.

4. The authorized facility locations shall be as shown in the EA, as supplemented by filed alignment sheets. **As soon as they are available, and before the start of construction,** Midwestern shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by

this Order. All requests for modifications of environmental conditions of this Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

Midwestern's exercise of eminent domain authority granted under Natural Gas Act (NGA) section 7(h) in any condemnation proceedings related to this Order must be consistent with these authorized facilities and locations. Midwestern's right of eminent domain granted under NGA section 7(h) does not authorize it to increase the size of its natural gas pipeline to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5. Midwestern shall file with the Secretary detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, pipe storage yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, and documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by the Upland Erosion Control, Revegetation, and Maintenance Plan, minor fieldrealignments per property owner needs and requirements which do not affect other property owners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a. implementation of cultural resources mitigation measures;
b. implementation of endangered, threatened, or special concern species mitigation measures;
c. recommendations by state regulatory authorities; and
d. agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6. **Within 60 days of the acceptance of this certificate and before construction** begins, Midwestern shall file an initial Implementation Plan with the Secretary for review and written approval by the Director of OEP describing how Midwestern will implement the mitigation measures required by this Order. Midwestern must file revisions to the plan as schedules change. The plan shall identify:

   a. how Midwestern will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;
   b. the number of environmental inspectors assigned per spread, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;
   c. company personnel, including environmental inspectors and contractors, who will receive copies of the appropriate material;
   d. the training and instructions Midwestern will give to all personnel involved with construction and restoration (initial and refresher training as the project progresses and personnel change);
   e. the company personnel (if known) and specific portion of Midwestern organization having responsibility for compliance;
   f. the procedures (including use of contract penalties) Midwestern will follow if noncompliance occurs; and
   g. for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

      (1) the completion of all required surveys and reports;
      (2) the mitigation training of onsite personnel;
      (3) the start of construction; and
      (4) the start and completion of restoration.

7. Midwestern shall employ at least one environmental inspector per construction spread. The environmental inspector shall be:

   a. responsible for monitoring and ensuring compliance with all mitigation measures required by this Order and other grants, permits, certificates, or other authorizing documents;
   b. responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

c. empowered to order correction of acts that violate the environmental conditions of this Order, and any other authorizing document;
d. a full-time position, separate from all other activity inspectors;
e. responsible for documenting compliance with the environmental conditions of this Order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and
f. responsible for maintaining status reports.

8. Midwestern shall file updated status reports prepared by the head environmental inspector with the Secretary on a **weekly** basis **until all construction and restoration activities are complete**. On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

a. the current construction status of the project, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;
b. a listing of all problems encountered and each instance of noncompliance observed by the environmental inspector(s) during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);
c. corrective actions implemented in response to all instances of noncompliance, and their cost;
d. the effectiveness of all corrective actions implemented;
e. a description of any landowner/resident complaints which may relate to compliance with the requirements of this Order, and the measures taken to satisfy their concerns; and
f. copies of any correspondence received by Midwestern from other federal, state or local permitting agencies concerning instances of noncompliance, and Midwestern's response.

9. Midwestern must receive written authorization from the Director of OEP **before commencing service** from the project. Such authorization will only be granted following a determination that rehabilitation and restoration ofthe right-of-way and other areas affected by the project are proceeding satisfactorily.

10. **Within 30 days of placing the certificated facilities in service**, Midwestern shall file an affirmative statement with the Secretary, certified by a senior company official:

a. that the facilities have been constructed and installed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

b. identifying which of the certificate conditions Midwestern has complied with or will comply with. This statement shall also identify any areas affected by the project where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

11. Midwestern shall have a qualified geologist on call during all pipeline construction to plan and review construction methods and provide technical support to mitigate and/or avoid potential sinkhole locations along the pipeline. The geologist shall confirm that any reroutes are located far enough from the sinkholes to avoid affecting pipeline operations.

12. Midwestern shall complete karst field surveys on all parcels crossed by the project that were previously inaccessible. If any caves are identified which have a known subsurface extent beneath the pipeline route, Midwestern shall identify whether it would be affected by construction activities and provide technical support demonstrating how Midwestern would mitigate and/or avoid potential impacts on these caves. The survey reports and findings shall be filed with the Secretary for review and written approval by the Director of OEP **prior to construction**.

13. Midwestern shall locate and field inventory all water well and spring locations identified for domestic and livestock water supply use within 150 feet of all construction work areas. Midwestern shall develop site-specific mitigation measures for construction activities in these locations and shall, with the landowner's permission, conduct pre- and post-construction monitoring of yield and water quality for these wells and springs. Midwestern shall file a report regarding these water well and spring measures with the Secretary for review and written approval by the Director of OEP **prior to construction**.

14. **Within 30 days of placing the facilities in service**, Midwestern shall file a report with the Secretary discussing whether any complaints were received concerning yield or water quality and how each was resolved, and describing any damages resulting from construction and how the damages were repaired.

15. Midwestern shall prepare and file site-specific construction and mitigation plans for the crossing of each hard-bottom stream for the

review and written approval of the Director of OEP **prior to construction.** These plans should identify the streambed rock type, state whether or not blasting would be required, and describe the measures Midwestern would implement to ensure its construction does not cause a loss of stream hydrology.

16. Midwestern shall conduct surveys for federally listed species along those segments of the route that were previously inaccessible. **Prior to initiation of surveys**, Midwestern shall consult with the U.S. Fish and Wildlife Service (FWS) for appropriate survey methods and timing windows. Midwestern's completed survey report and any FWS comments on the surveys shall be filed with the Secretary, and contain the following information:

    a. name(s) and qualifications of the person(s) conducting the survey;
    b. method(s) used to conduct the survey;
    c. date(s) of the survey;
    d. area surveyed (include the mileposts surveyed); and
    e. proposed mitigation that would substantially minimize or avoid the potential impacts.

    Midwestern shall **not begin construction activities until:**

    a. we receive comments from the FWS regarding the proposed action;
    b. we complete any required informal or formal consultation with the FWS; and
    c. Midwestern has received written notification from the Director of OEP that construction or use of mitigation may begin.

17. Midwestern shall develop and implement an environmental complaint resolution procedure that remains active for at least 3 years following the completion of construction. The procedure shall provide landowners with clear and simple directions for identifying and resolving their environmental mitigation problems/concerns during construction of the project and restoration of the right-of-way. **Prior to construction,** Midwestern shall mail the complaint resolution procedures to each landowner whose property would be crossed by the project.

a. In its letter to affected landowners, Midwestern shall:

   i. provide a local contact and telephone number that the landowners should call first with their concerns; the letter should indicate how soon a landowner should expect a response;
   ii. instruct the landowners that, if they are not satisfied with the response, they should call Midwestern's Hotline; the letter should indicate how soon to expect a response; and
   iii. instruct the landowners that, if they are still not satisfied with the response from Midwestern's Hotline, they should contact the Commission's Enforcement Hotline at (888) 889-8030 or at hotline@ferc.gov.

b. In addition, Midwestern shall include a table in its **weekly** status report containing the following information for each problem/concern:

   i. the identity of the caller and the date of the call;
   ii. the identification number from the certificated alignment sheet(s) of the affected property and location by milepost;
   iii. a description of the problem/concern; and
   iv. an explanation of how and when the problem was resolved, will be resolved, or why it has not been resolved.

18. Midwestern shall **defer construction and use** of facilities and staging, storage, and temporary work areas and new or to-be-improved access roads **until**:

   a. Midwestern files the Tennessee State Historic Preservation Office's (SHPO) comments on the architectural report;
   b. Midwestern files archaeological and architectural survey reports for the denied access areas and any additional areas remaining to be surveyed, and the Tennessee SHPO's comments on the reports;
   c. Midwestner files any required Phase II evaluation report, and the Tennessee SHPO's comments on the report;
   d. Midwestern files any required treatment plans, and the Tennessee SHPO's comments on the plans;
   e. the Advisory Council on Historic Preservation is afforded an opportunity to comment, if historic properties would be adversely affected; and

f. the Director of OEP reviews and approves all reports and plans and notifies Midwestern in writing that it may proceed with treatment or construction.

All material filed with the Commission containing **location, character, and ownership information** about cultural resources shall have the cover and any relevant pages therein clearly labeled in bold lettering: **"CONTAINS PRIVILEGED INFORMATION—DO NOT RELEASE."**

19. **Prior to construction,** Midwestern shall file for review and written approval of the Director of OEP, its final site-specific plan for construction activities in the vicinity of the City of Portland's water treatment facilities. Midwestern shall provide any mitigation measures that it would implement to ensure that public drinking water supplies are not affected during construction.